**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| MELISSA MELINDA MATTHEWS, | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:15-cv-02904 |
| | § | |
| NANCY BERRYHILL, ACTING | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | |

**MEMORANDUM AND RECOMENDATION ON**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management and recommendation on all dispositive matters, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Before the Court is the Commissioner's Motion for Summary Judgment on Matthews' claims. Having considered the motion, the applicable legal authorities, and all matters of record, it is **RECOMENDED** that the Commissioner's Motion for Summary Judgment be **GRANTED**.

*Background*

On March 15, 2012, Plaintiff Melissa Matthews, filed an application for Supplemental Security Income benefits ("SSI") under Title XVI of the Social Security Act ("the Act"), and for Disability Insurance Benefits ("DIB") under Title II of the Act. *See* 42 U.S.C. § 1382. (Transcript ["Tr."] at 128-129). In her application for benefits, Matthews claimed that she has been unable to work since March 19, 2009, because she has spinal stenosis, Bell's Palsy, and depression.[1] (*See* Tr. at 94). On June 18, 2012, the SSA found that Matthews was not disabled

---

[1] Bell's palsy is a paralysis of a facial nerve. It can result from trauma, compression of the nerve, or an infection. It may be transient or permanent. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 181 (5th ed. 1998).

under the Act, and so her application was denied. (Tr. at 94-99). Plaintiff petitioned for a reconsideration of that decision, but her claim was again denied on November 16, 2012. (Tr. at 100-102). She then successfully requested a hearing before an administrative law judge ("ALJ"). (Tr. at 107-114). That hearing took place on February 20, 2014, before Robert Hodum. (Tr. at 44). Plaintiff testified at the hearing and was assisted by an attorney, Bonita Anderson Williams. (Tr. at 46). Stephen Zanskas, Ph.D, a vocational expert witness, testified at the hearing as well. (Tr. at 79-87). No medical experts testified at the hearing.

On April 9, 2014, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R. §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

5. If an individual's impairment precludes performance of his past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled that,

under this analysis, Matthews has the burden to prove any disability that is relevant to the first four steps. *Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that Plaintiff is able to perform other work that exists in the national economy. *Myers v. Apfel,* 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125. "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994)(citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ found that Plaintiff "has not engaged in substantial gainful activity since March 19, 2009, the alleged onset date." (Tr. at 12). The ALJ concluded that Matthews suffers from the severe impairments of lumbar and cervical degenerative disc disease, obesity, headaches, and an affective disorder. (*Id.*). The ALJ further found that Plaintiff's impairments do not meet, or equal in severity, the medical criteria for any disabling impairment in the applicable SSA regulations.[2] (Tr. at 13). The ALJ then assessed Plaintiff's residual functional capacity ("RFC"), and found that she is capable of performing medium exertion work, but must avoid concentrated exposure to extreme cold, vibrations and hazards.[3] (Tr. at 16). He found that Matthews is able to understand and carry out simple instructions and can use her judgment to make decisions. (*Id.*). She is also able to interact with coworkers and supervisors on a frequent basis, occasionally interact with the public on a superficial basis, and handle occasional changes in the workplace. (*Id.*). With these restrictions, the ALJ found that Matthews is able to work as a cleaner, packager, production assembler, or small product assembler. (Tr. at 22). For that reason, he concluded that Matthews is "not [] under a disability, as defined in the Social Security Act," and he denied her application for benefits on April 9, 2014. (Tr. at 22-23).

Plaintiff requested an Appeals Council review of the ALJ's decision. (Tr. at 6). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's actions, findings, or conclusions are not supported

---

[2] A claimant is presumed to be "disabled" if her impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

[3] "Medium work" involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. 20 C.F.R. §§404.1567(c). The ALJ defined "concentrated exposure" to be exposure to the condition for more than two-thirds of the time in an eight hour day. (Tr. at 16).

by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On August 19, 2015, the Appeals Council denied Plaintiff's request for a remand, finding that no applicable reason for review existed. (Tr. at 1-4). With this ruling, the ALJ's decision became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).

On September 30, 2015, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (See, Complaint, Docket Entry #1). To her handwritten complaint, Plaintiff attached records for medical treatment that she had received after the ALJ's denial of her claim. (*Id.*). The Commissioner has filed a motion for summary judgment, and argues that the decision by the ALJ was appropriate and should not be disturbed. (See, Defendant's Motion for Summary Judgement). Matthews has not filed a response.[4]

### Standard of Review

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64

---

[4] Any failure to respond is "taken as a representation of no opposition." S.D. Tex. Local Rule 7.4. Even though Matthews did not file a response, summary judgment may not be awarded by default. *See Hibernia Nat'l Bank v. Admin. Cent. Sociedad Anonima*, 776 F.2d 1277, 1279 (5th Cir.1985). The Commissioner, as the movant, has the burden of establishing the absence of a genuine issue of material fact. The court may not grant the motion, regardless of whether any response was filed, unless the Commissioner has met her burden. *See Davis v. Astrue*, 2012 WL 9392188, at *1 (S.D. Tex. Feb. 3, 2012) (*quoting Hetzel v. Bethlehem Steel Corp.*, 50 F.3d 360, 362 n. 3 (5th Cir.1995)).

F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

### *Medical Facts, Opinions, and Diagnoses*

Matthews has suffered from low back pain since at least 2003. The first record of treatment is from July 15, 2003, when she had a magnetic resonance image ("MRI") of her lumbar spine. That test was ordered by her primary care physician, Fereidoon Parsioon, M.D. ("Dr. Parsioon"), at Christ Community Medical Clinic in Tennessee.[5] (Tr. at 221). Dr. Monica Umpierrez interpreted the MRI as showing bulging discs at L4-5 and L5-S1, but she did not see any evidence of significant spinal stenosis or neural foraminal narrowing.[6] An electromyogram ("EMG") and a nerve conduction study of Plaintiff's lower extremities were also done, and the results from both tests were normal.[7] (Tr. at 223-224). An ultrasound of Plaintiff's bladder, to determine why she had frequent instances of bladder urgency and incontinence, showed no structural defects, and she had no history of kidney stones or urinary tract infections. (Tr. at 247-248). The urologist, David Hickey, M.D., believed that muscle spasms were the cause of her

---

[5] Plaintiff lived in Tennessee through the time of the administrative hearing.
[6] Spinal stenosis is an abnormal condition characterized by the constriction or narrowing of the openings in the spinal column or the spinal canal. MOSBY'S at 1539. Neural foraminal narrowing is the constriction or narrowing of the nerve passageways in the spine. MOSBY'S at 652.
[7] An EMG measures the electrical activity in the muscles, and it is used to detect damage to motor nerves. MOSBY'S at 545.

urinary complaints. (Tr. at 248). Dr. Parsioon prescribed Detrol LA for overactive bladder syndrome. (Tr. at 225).

Dr. Parsioon then ordered a myelogram and CT scan of Plaintiff's lumbar spine on September 5, 2003. His notes show that he was trying to find the cause of Plaintiff's low back pain, which radiated into her buttocks. (Tr. at 242-244). The radiologist, Dr. David Morris, ("Dr. Morris") interpreted those tests to show mild disc bulges at L4-L5 and L5-S1, with spinal stenosis from L3-S1. (Tr. at 244). Dr. Morris believed that he saw evidence of epidural lipomatosis, and also noted narrowing of the spinal canal at the levels of the disc bulges.[8] (Tr. at 244). Matthews then returned to Dr. Parsioon's office on September 8, 2003, to discuss the results of the diagnostic examinations. (Tr. at 241). At that visit, she complained of pain in her lower back and buttocks, but did not have any numbness or weakness in her legs. (Tr. at 241) A straight leg raise test was negative, and there was no indication of motor or sensory deficits.[9] Dr. Parsioon ordered a lumbar epidural steroid block with three weeks of physical therapy. He also told Matthews to lose weight. (Tr. at 241).

Dr. Parsioon referred Matthews to Dr. Alan Kraus ("Dr. Kraus") for the lumbar epidural steroid injection. (Tr. at 225). Plaintiff told Dr. Krauss, on September 24, 2003, that her back pain had started two years earlier, but had become much worse over the last two months. (*Id.*). Matthews described a pulling sensation in her side, and told Dr. Kraus that Celebrex and Vioxx were ineffective, but Lortab helped relieve some of her back pain.[10] (Tr. at 225). Matthews complained of pain in her lower back during the physical examination. (Tr. at 226). A straight

---

[8] Spinal epidural lipomatosis is an unusual deposit of fatty tissue in the joints of the spine that can put pressure on the spinal nerves. MOSBY'S at 947.
[9] A straight leg raising test is used to confirm an injury to the sciatic nerve, or to reproduce symptoms consistent with a herniated disc in the lumbar spine. MOSBY'S at 1546.
[10] At that time, Plaintiff was also taking Detrol LA, for overactive bladder syndrome, and Valium.

leg raise test caused pain in both legs at 70-80 degrees.  (Tr. at 226).  Although she had some tenderness over the lumbar region, she had no motor, sensory or reflex deficits.  (*Id.*).  Following the physical examination, Dr. Kraus administered the lumbar injection.  (Tr. at 226-227).

Matthews returned to Dr. Parsioon and told him that her pain was much improved after the injection, and that she had only a little back pain.  (Tr. at 232).  She denied having any weakness or numbness in her legs.  (Tr. at 232).  She began physical therapy two days later, on October 8, 2003.  (Tr. at 229, 233).  At her first visit, Plaintiff said her pain was a "5" on a scale of "1 to 10," that it radiated to her legs, and that it caused numbness and tingling.  (Tr. at 233).  She also complained of muscle weakness, stiffness, and a diminished range of motion in her spine.  (Tr. at 233).  Plaintiff received treatment three times a week for three weeks, and was also given exercises to do at home.  (Tr. at 229, 233).  Plaintiff showed improvement and by October 29, 2003, said her pain had decreased from "5/10" to "2/10."  (Tr. at 235).  Her lower back was no longer tender to the touch, and her range of motion had improved.  (*Id.*).

On November 6, 2003, one week later, Plaintiff saw Dr. Parsioon.  (Tr. at 231).  The effects of the injection had worn off, and she complained of constant low back pain and pain in both legs.  Tr. at 231).  She also said that the physical therapy had helped only a little bit.  (Tr. at 231).  She denied having weakness or numbness in her legs.  (Tr. at 231).  A straight leg test was negative, and she did not show any motor or sensory deficits.  (Tr. at 231).  Dr. Parsioon recommended another epidural block, and told her that if her pain did not improve, he would consider surgery for her spinal stenosis.  (*Id.*).  He also instructed her to continue to exercise and to diet to lose weight.  (Tr. at 331).

The next record of treatment is from September 28, 2006, almost three years later, when Plaintiff went to Christ Community Health Services for treatment of complications from uterine

fibroids.  (Tr. at 255).  She also complained of a sore throat and left ear pain, and became emotional when asked to describe the stressors in her life.  (Tr. at 255).  She was noted to have chronic low back pain from spinal stenosis, but she told the doctor that she had declined surgery. (*Id.*).  She was prescribed Lodine, loratadine, Celexa, and Prilosec, and instructed to see a gynecologist.[11]  (*Id.*).  She returned a month later and reported that she was still anxious, had headaches, and was fatigued, but Xanax was helping.[12]  (Tr. at 254).  She had not seen a gynecologist as instructed.  (Tr. at 254).  The Lodine was replaced by Relafen, and she was prescribed tramadol, Celexa, Prilosec, Buspar and told, again, to follow up with a gynecologist.[13] (Tr. at 254).  Matthews was next seen on June 1, 2007, complaining of a rash.  (Tr. at 252).  She did not complain of headaches or low back pain during that visit.  (*Id.*).  It was apparently her last medical treatment for several years.

Approximately five years later, on May 29, 2012, Plaintiff was examined by Edward Amos, Ph.D. ("Dr. Amos"), a clinical psychologist, acting on behalf of the state.  (Tr. at 263-267).  Matthews explained to him that she sought disability benefits because of "spinal stenosis, Bell's palsy, and depression."  (Tr. at 263).  She was accompanied to Dr. Amos' office by a friend from her church.  (Tr. at 263, 265).  Dr. Amos described Matthews as "morbidly obese," and noted that she allowed her companion to fill out the paperwork for her, even though she seemed capable of doing so.  (Tr. at 263).  He found her to be pleasant, cooperative, and polite, although "somewhat dramatic in her presentation."  (Tr. at 263).  She cried intermittently throughout the interview, and said that she was having "an emotional breakdown" on several occasions.  (Tr. at 265).

---

[11]   Lodine is a nonsteroidal anti-inflammatory.  Loratadine is an antihistamine.  Celexa is an antidepressant.
[12]   It is not clear from the records what doctor prescribed Xanax.
[13]   Relafen is a nonsteroidal anti-inflammatory medication.  Tramadol is a pain reliever.  Buspar is an anti-anxiety medicine.

Dr. Amos' history was based almost entirely on Matthews' statements, as he was provided only one, illegible office note, from Christ Community Health Center. (Tr. at 263). He found the reliability of the information Plaintiff gave him to be "at least average to better." (Tr. at 263). Matthews reported that she had worked until approximately three years earlier when she was laid off. (Tr. at 264). Before that, she had worked for five years in a customer service job, but left, because it was too stressful, and because she was beginning to suffer from significant back pain. (Tr. at 264). Matthews acknowledged that she had never been seen by a psychologist or a psychiatrist, even though she had been diagnosed with anxiety and depression, and had been prescribed medication for those conditions in the past. (Tr. at 264). At the time of the examination, she was not taking medication for any of her physical or mental problems because she had not seen a doctor in more than two years. (Tr. at 264). She complained that she did not have health insurance, and could not afford medical or mental health treatment. (Tr. at 264). However, she also told Dr. Amos that she drank alcohol several times a week, and smoked marijuana because it helped with her pain, and relaxation. (Tr. at 264).

When asked to describe her daily routine, Matthews explained that she lived alone and relied on support from members of her church for "daily services and financial resources." (Tr. at 264). Her level of pain and anxiety dictated her daily schedule, and many days she felt overwhelmed and stayed in bed all day. (Tr. at 265). Although she had been completely self-sufficient and independent in the past, she now needed others to care for her. (Tr. at 265). She did very few household chores, rarely cooked, rarely drove, and did not always brush her teeth or change her clothes. (Tr. at 265). Plaintiff told Dr. Amos that she believed she had been depressed for most of her life, because of a "chaotic childhood," but that she had been in denial about her depression. (Tr. at 265). She was not suicidal, and did not have any sensory

disturbances, except for an unusual sensation on those occasions when she was in extreme pain. (Tr. at 265). Other than her frequent crying spells, Dr. Amos did not see any unusual behavior during the examination. Plaintiff's reasoning abilities were intact, her speech was clear, and she was able to communicate at a high level. (Tr. at 266). She did not exhibit any psychotic or paranoid thoughts, but did have some mild difficulty in remembering things and in concentration. (Tr. at 366).

Dr. Amos diagnosed her to have suffered from a single episode of "major depression," of "moderate severity without psychotic features;" spinal stenosis; and morbid obesity. He assigned her a GAF score of 50.[14] It was his opinion that she had moderate to severe limitations in persistence and pacing. (Tr. at 267). She did not have significant limitations in her ability to remember things or to concentrate, but she did have difficulty in solving problems and completing difficult tasks. (Tr. at 267). She also was found to have mild to moderate impairment of her social skills. (Tr. at 267).

Matthews was then examined by Dr. Linda Yates ("Dr. Yates"), an emergency medicine specialist, acting on behalf of the state, on May 31, 2012. (Tr. at 270-273). Dr. Yates examined Plaintiff to assess her limitations from spinal stenosis and Bell's Palsy. (Tr. at 270). Matthews told Dr. Yates that her entire body hurt, and that she had shooting pain and electrical shocks all over. (Tr. at 270). She told Dr. Yates that these symptoms began in 2004, and worsened in 2010. (Tr. at 270). Dr. Yates found Plaintiff to be "somewhat dramatic," and reported that she

---

[14] The GAF scale is used to rate an individual's "overall psychological functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). The scale ascribes a numeric range from "1" ("persistent danger of severely hurting self or others") to "100" ("superior functioning") as a way of categorizing a patient's emotional status. *See id.* A GAF score between 41-50 "reflects serious symptoms" or "any serious impairment in social, occupational, or school functioning." *Id.* A GAF score of 51-60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.*

was "slumped back in the chair" with her "head resting on the exam table" when she entered the room. (Tr. at 271). When asked to stand, Matthews did so extremely slowly, and walked, while dragging her feet, on request. (Tr. at 272). Dr. Yates questioned Plaintiff's effort on several of the tests to evaluate her range of motion and strength. (Tr. at 272-273). Plaintiff complained of low back pain and flinched at the lightest touch from Dr. Yates at the beginning of the examination. However, later, Dr. Yates was able to distract Plaintiff and palpate her back without any complaints or signs of discomfort. (Tr. at 272). Matthews complained of pain in her back and legs during the straight leg raise test, beginning at 30 degrees of elevation, but was able to sit up without assistance. (Tr. at 273). Dr. Yates saw no evidence of Bell's Palsy. (Tr. at 273). Dr. Yates found that a complete, thorough, medical and neurological evaluation of Plaintiff was necessary to determine if there was an underlying medical or spinal problem that explained her complaint of pain throughout the entire body. Dr. Yates also questioned whether there was a psychological component to Plaintiff's complaints. (Tr. at 273). Without a further medical evaluation, Dr. Yates could not "give an accurate assessment." (Tr. at 273). Dr. Yates provided Matthews with a list of neighborhood clinics that would treat uninsured patients. (Tr. at 271).

Mark Gilson, Ph.D. ("Dr. Gilson") completed a Psychiatric Review Technique on June 7, 2012. He reviewed Dr. Amos' report, and gave "great weight" to it in forming his opinions. (Tr. at 287). Dr. Gilson found that Plaintiff's description of her symptoms and limitations, when examined by Dr. Amos, to be credible and consistent. (Tr. at 287). He found Plaintiff to have moderate limitations in her "activities of daily living;" "social functioning;" and ability to maintain "concentration, persistence, or pace." (Tr. at 285). He determined that Matthews had a "mood disorder" that did not satisfy the criteria of an affective disorder. (Tr. at 278). He did not

find any evidence that Plaintiff had ever experienced any episodes of decompensation. (Tr. at 285).

Dr. Gilson also completed a Mental Residual Functional Capacity Assessment. (Tr. at 289-292). He determined that Matthews was moderately limited in her abilities to understand, remember, and carry out detailed instructions. (Tr. at 289). She was also moderately limited in her ability to maintain attention and concentration for extended periods of time, and to perform work at a consistent pace. (Tr. at 289-290). She had moderate limitations in her ability to interact with the general public; respond to changes in the work setting; and to set realistic goals or make plans by herself. (Tr. at 290). He concluded that she could understand and remember simple directions, concentrate for at least two hours during a regular work day, and manage the demands of a working environment. (Tr. at 291).

A Physical Residual Functional Capacity Assessment was completed by Charles Settle, M.D. ("Dr. Settle"), on June 15, 2012. To do this assessment, Dr. Settle only reviewed Plaintiff's medical records and the report from Dr. Yates. (Tr. at 293-301). He believed that Plaintiff could occasionally lift items weighing up to fifty pounds, and frequently carry objects weighing up to twenty-five pounds. (Tr. at 294). She could stand and walk for six hours in an eight hour workday, and sit for the same length of time. (Tr. at 294). In reaching these conclusions, Dr. Settle considered whether Plaintiff's complaints were attributable to her diagnosed medical conditions. (Tr. at 298). Matthews complained that she had pain over her entire body, swelling in her legs, and could walk only five steps before the need to rest for two minutes. (Tr. at 298). She said that she used a cane, crutches, and a back brace, and had trouble sitting, standing, bending, kneeling, climbing stairs, and using her hands. (Tr. at 298). Dr. Settle identified her diagnosed conditions to be mild degenerative disc disease of the lumbar spine,

13

migraine headaches, and obesity. (Tr. at 293). Dr. Settle stated that her complaints of lower back pain and pain in both legs were consistent with the diagnosed conditions of degenerative disc disease, migraines, and obesity, but that the complaints of pain throughout her entire body, fatigue, and swelling in her legs were not. (Tr. at 298). He concluded that the severity and duration of her reported symptoms were disproportionate to the conditions she had, and he pointed out that she had not received any treatment in almost six years. (Tr. at 298). He found her statements to be only "partially credible at best," and that she was "extremely obviously full of malingering." (Tr. at 298).

Plaintiff resumed her treatment with Christ Community Health Services on August 2, 2012.[15] (Tr. at 304). She complained of pain in her back, legs and hips, and said that she had recently injured her left ankle. (*Id.*). A straight leg raising test caused pain on both sides at only ten to fifteen degrees of elevation. (*Id.*). She was diagnosed as suffering from chronic back pain with spinal stenosis and osteoarthritis. (*Id.*). She was told to schedule an MRI of the lumber spine, and she was prescribed amitriptyline, gabapentin, and etodolac.[16] (*Id.*). She was tearful during the examination, but did not complain of pain throughout her body. (*Id.*).

Amin Azimi, Ed.D.[17] ("Dr. Azimi"), a psychologist acting on behalf of the state, reviewed the Psychiatric Review Technique completed by Dr. Gilson during the reconsideration of Plaintiff's claim. (Tr. at 307). He pointed out that there were no allegations that Plaintiff's mental condition had worsened since Dr. Gilson's report, no allegations of a new impairment, and no additional mental health treatment. Based on this, Dr. Azimi affirmed Dr. Gilson's conclusions, because they were "substantively and technically correct." (*Id.*). A second Physical

---

[15] This is the first time Plaintiff received medical treatment after the alleged onset of her disability in March, 2009.

[16] Amitriptyline is used to treat nerve pain and depression. Gabapentin is used to treat nerve pain, and etodolac is a non-steroidal anti-inflammatory commonly used to treat arthritis.

[17] An Ed.D., is a doctoral degree issued by the college of education.

Residual Functional Capacity Assessment was completed on November 15, 2012. (Tr. at 308-315). This time, R. Glenn Carmichael, M.D. listed only one diagnosis for Plaintiff, lumbar spondylosis. (Tr. at 308). He made two changes to the prior Assessment. (Tr. at 309, 312, 295, 297). He removed any limitation on her ability to climb stairs, balance, stoop, kneel, crouch, or crawl. (Tr. at 295, 310). He also said that she should avoid concentrated exposure to extreme cold, vibration, or unprotected heights. (Tr. at 312, 297). These limitations were consistent with the established medical evidence that Plaintiff had lumbar spondylosis, according to Dr. Carmichael. (Tr. at 313). He pointed out that, during Dr. Yates' physical examination, Plaintiff moved very slowly and showed poor effort, while complaining of symmetric weakness and loss of range of motion in all extremities. (Tr. at 310). However, Dr. Carmichael reported that there was no objective neurological or musculoskeletal abnormality to explain the symmetrical weakness and loss of range of motion in both her arms and legs. (Tr. at 310).

Dr. Carmichael's review did not include the records from treatment at CCHS Third Street Health Center on November 9, 2012. (Tr. at 341). At that time, Plaintiff was seen by Sarah Root, a physician's assistant, and she complained of "body pain" related to a diagnosis of "pain disorders related to psychological factors."[18] (*Id.*). Plaintiff told Ms. Root that her pain levels were slightly improved with gabapentin and Amitriptyline, but she needed Flexeril at least three times a day because of her generalized pain.[19] (*Id.*). Matthews said that she had started taking the anti-depressant Paxil two weeks earlier. She complained of memory loss, and had trouble remembering if she had taken her medication, so she had a friend dispense the medicine to her. (*Id.*). Even though she complained of pain over all her body, she did not appear to be in distress

---

[18] This clinic is part of the Christ Community Health Services network, and she was seen at a different location on August 2, 2012, before moving her care to this clinic. (See, Tr. at 341, 306). It is not known what physician, if any, diagnosed "pain disorder related to psychological factors."

[19] It is not known when Plaintiff was prescribed Flexeril.

during the physical examination. (Tr. at 341). Ms. Root described Plaintiff as "depressed" and "tearful." Ms. Root encouraged her to seek treatment with a mental health professional from the list that had been provided at an earlier visit. (*Id.*). Plaintiff was also referred to a neurologist for treatment of chronic pain syndrome, and to evaluate her for rheumatoid arthritis. (Tr. at 339-340).

Matthews saw Dr. Mahsa Matloobi ("Dr. Matloobi"), a neurologist at The Regional Medical Center at Memphis, on February 7, 2013. (Tr. at 320). She told the doctor that her back pain had started twenty four years earlier. (*Id.*). Plaintiff complained of neck pain radiating down her left arm which caused numbness, tingling and weakness in her arm, hand and fingers. (*Id.*). She also said that her low back pain radiated down both legs and caused weakness in her feet. (*Id.*). Dr. Matloobi noted a "lack of effort" by Plaintiff during the physical examination. (*Id.*). Dr. Matloobi ordered an MRI of the cervical spine, and that was performed on February 28, 2013. (Tr. at 337). While the films were blurred, because Plaintiff moved during the examination, they were still clear enough to show that her thyroid was enlarged, and that her cervical spine showed evidence of degenerative changes throughout. There was no evidence that the spinal canal or spinal nerves were affected, however. (Tr. at 337).

Plaintiff returned to Dr. Matloobi on April 25, 2013 to discuss the results of the MRI. (Tr. at 332). Matthews told Dr. Matloobi that the pain in her left shoulder had improved, but now her right shoulder hurt. (*Id.*). She had low back pain radiating only to her right leg, and not both legs as it had at the last visit. (*Id.*). She told Dr. Matloobi that gabapentin helped to relieve her pain only a little, and that only Percocet was effective.[20] (*Id.*). Plaintiff cried throughout the interview. (*Id.*). When Dr. Matloobi tested Plaintiff's ability to rotate her neck and low back,

---

[20] There is no evidence in the medical records that Plaintiff was ever prescribed Percocet.

she gave her a score of one out of five, reflecting significant limitations. But Dr. Matloobi noted that Plaintiff was not trying, and was instead asking for narcotics. (*Id.*). Dr. Matloobi diagnosed mild degenerative joint disease in the cervical spine, refilled Plaintiff's prescription for gabapentin, and declined to prescribe narcotics. She told Plaintiff to return in one month. (Tr. at 332).

Plaintiff went back to The Regional Medical Center at Memphis on July 11, 2013, and was seen by a different doctor. (Tr. at 316-317). She complained of pain all over her body, especially on the right side. (Tr. at 317). She again cried during the interview portion of the examination. (Tr. at 316). After reviewing the symptoms, the doctor said that Matthews' "pain cannot be explained with any of [the] examination findings." (*Id.*). The doctor further said it was "not likely [to be caused by] fibromyalgia." (*Id.*). Plaintiff was discharged from further treatment at that clinic and referred back to Dr. Carmichael for pain management. (*Id.*).

### *Educational Background, Work History, and Present Age*

At the time of the hearing, Matthews was 52 years old. (Tr. at 49). She had graduated from high school and had completed one year of college. (Tr. at 49). Plaintiff's past relevant work included jobs as a promotion supervisor at a casino, marketing coordinator at a casino, customer service representative at a newspaper, a daycare provider, and a human resource coordinator. (Tr. at 54-62). She was laid off, in 2009, from her position as a human resource coordinator. She intended to find another job, but gradually realized that she would not be able to return to the workforce because of her limitations, and so she filed for disability benefits in 2012. (Tr. at 50). At the time of the hearing, a friend from church had allowed Matthews to live in her house, because Plaintiff had helped to care for her mother. (Tr. at 51).

*Subjective Complaints*

In her application for benefits, Matthews claimed that she has been unable to work since March 19, 2009, because of low back pain and depression. (See, Tr. at 90, 128). At the hearing, Matthews testified that she was suffering from lumbar spinal stenosis, fibromyalgia, incontinence, headaches, and severe pain down the right side of her body, as well as less significant pain on the left. (Tr. at 49). She used a cane to walk at the time of the hearing, although it had not been prescribed by any treating physician. (Tr. at 49). She claimed that these impairments, as well as panic attacks and carpal tunnel syndrome, prevented her from returning to work. (Tr. at 63).

Matthews testified that she stopped driving in 2012, because she experienced panic attacks when doing so. (Tr. at 52-53). She also said that she did not feel safe driving, because the pain in her right side affected her mobility and her ability to turn her head. (Tr. at 52-53). She explained that just being a passenger in a car could cause panic attacks, so she only goes out once or twice a month. (Tr. at 53). She claimed that the idea of going out in public caused her to have panic attacks, and that she vomited the morning of the hearing. (Tr. at 63). She explained that she had not received treatment for her depression and panic attacks, because she did not have insurance, was not able to find free counseling or treatment, and had been able to cope with her depression in the past because of her support system. (Tr. at 63-65).

Plaintiff said that she began using a cane a couple of months before the hearing, because she was falling down and had trouble standing. (Tr. at 65). She claimed that she could only stand for about five minutes at a time. (Tr. 66). She spent most of her days in bed, and relied on her friends from church to check on her and cook for her. (Tr. at 66). Matthews testified that she has burning, shooting pain from her neck to her toes on her right side on a daily basis, and

when she stands the pain in her legs worsens. (Tr. at 70). She is not able to raise her right arm over her head. She can lift a coffee cup, but not much more, with that arm. (Tr. at 70). She also said that she is not able to do housework because she has carpal tunnel syndrome in her hands, which causes cramps and pain.[21] (Tr. at 70). She told the ALJ that she is able to place only a few pieces of laundry in the washing machine before her hands bother her, and then she must wait for someone to finish the task for her. (Tr. at 70). She testified that she is incontinent, especially at night, and must wash clothes frequently. (Tr. at 70-71). The only other housework she is capable of doing is light dusting. (Tr. at 72).

Matthews also testified that she has a constant tingling, stabbing pain throughout her body. (Tr. at 72). Because of her constant back pain, she is only able to sit for fifteen minutes, and she has difficulty in walking. (Tr. at 73). As a result, she has three to four accidents a week when she is not able to make it to the bathroom quickly enough. (Tr. at 74). Plaintiff also described a recent occasion on which she fell, injuring her left knee. (Tr. at 74). She explained that she already had pain in both knees, but the fall made the left knee hurt constantly, even to the touch. (Tr. at 74). She believes that she tore something in her knee, and she tried to discuss it with the doctor at Christ Community Health Services. According to Plaintiff, because she did not have insurance, the doctor limited her appointment to fifteen minutes and told her she would be treated for one problem only. Her right-sided pain was the most significant complaint during that visit. (Tr. at 74-75).

---

[21] Plaintiff testified that she was diagnosed with carpal tunnel syndrome in 1992 when she sustained a neck injury. (Tr. at 71). She admitted that she had not received any treatment for that condition, and was able to work until 2009 without problem. (Tr. at 71).

Plaintiff's attorney asked the ALJ for some time after the hearing to submit additional records and an assessment of Plaintiff's condition. The ALJ allowed ten days to submit the additional evidence.[22] (Tr. at 77).

### Expert Testimony

The ALJ also heard testimony from Stephen Zanskas ("Mr. Zanskas"), a vocational expert. (Tr. at 50-62). He characterized Matthews' prior work experience as a human resources clerk to be "sedentary" in exertional level, and "semiskilled." (Tr. at 81). Her work in the daycare was classified as "light" and "semiskilled," while her position as a customer service representative was "sedentary" and "skilled." (Tr. at 81). Mr. Zanskas told the ALJ that Plaintiff had some transferrable skills, including the ability to manage and coordinate functions. (Tr. at 82).

The ALJ then described a hypothetical person to Mr. Zanskas:

> If we have a hypothetical individual, who is 51 years old, who has the jobs that you've described, has a high school education, and who is limited to a range of medium work as defined by the Commissioner's regulations, but should avoid concentrated exposure to extreme cold, and to avoid concentrated exposure to hazards, and concentrated exposure to vibrations. And I will define concentrated as more than two-thirds of the workday. . . . [T]hey can understand, remember, and carry out simple instructions. [The] individual could use judgment, . . . and [frequently] relate to supervisors and coworkers, [and] could occasionally relate to the public superficially, and deal with changes in the workplace.

(Tr. at 81-82). Mr. Zanskas confirmed that such a hypothetical person, with those limitations, would not be able to do any of the jobs held by Plaintiff in the past.[23] Mr. Zanskas then testified that a person with those limitations could be employed in either a medium duty or a light duty position. (Tr. at 84-85). Medium duty, unskilled positions that Plaintiff could handle include

---

[22] No additional evidence was submitted to the ALJ.
[23] Mr. Zanskas was asked, "That's going to knock out most of the past work, is that right?" He agreed it would. (Tr. at 82-83).

employment as an industrial cleaner or as a packaging line attendant. (Tr. at 84-85). Examples of light duty, unskilled jobs that Plaintiff could perform include positions as a production assembler, or as an assembler of small products, according to Mr. Zanskas. (Tr. at 85-86). Each of these jobs is available in significant numbers in the local and national economies. (Tr. at 84-86).

Mr. Zanskas was then questioned by Matthews' attorney. (Tr. at 86-87). He testified that if the hypothetical worker required a job that allowed her to sit or stand at will, she would only be able to work as a small products assembler. That limitation would also reduce the number of positions as a small products assembler that were available by at least half.[24] (Tr.at 86). If Plaintiff were to miss more than two days of work each month, none of the jobs would be appropriate. (Tr. at 87).

### The ALJ's Decision

Following the hearing, the ALJ made his written findings on the evidence. From his review of the record, he determined that Matthews was suffering from lumbar and cervical degenerative disc disease, obesity, headaches, and an affective disorder. He next found that those impairments were severe. (Tr. at 12). The ALJ then considered whether any of Plaintiff's impairments, individually or in combination, met or equaled in severity the requirements of any applicable SSA Listing. (Tr. at 13). He first noted that Matthews' obesity did not significantly affect her ability to move about and function, and it had not led to complications to her cardiovascular, musculoskeletal, or respiratory systems.[25] (Tr. at 13). He then considered her

---

[24] This would reduce the number of positions in the national economy to 10,000, and in the region to 750. (Tr. at 86 (testimony that there are approximately 20,000 positions as a small products assembler nationally, and 1,500 in Tennessee).

[25] Plaintiff had a body mass index ("BMI") of 38.6 at the time of the ALJ's decision. The National Institutes of Health considers a person "obese" if they have a BMI in excess of 30.0. (See, Tr. at 13, note 1).

degenerative disc disease. (Tr. at 13-14). The ALJ concluded that the "weight of the evidence of record" failed to demonstrate "compromise of a nerve root . . . or [compromise of] the spinal cord, with evidence of nerve root compression" from Plaintiff's degenerative disc disease, and therefore that condition did not meet or equal Listing 1.04, the applicable SSA Listing.[26] (Tr. at 13).

The ALJ next considered the evidence of Plaintiff's mental impairment. (Tr. at 14). He "relied heavily" on the opinion from the state agency expert, Dr. Gilson, and determined that Matthews did not have "marked" limitations in any area, and did not experience any episodes of decompensation.[27] Because of that, she did not meet the Listing criteria for an affective disorder. (Tr. at 14). The ALJ concluded that the cumulative effects of Plaintiff's alleged impairments imposed some limitations, but only those that were described in his residual functional capacity finding. (Tr. at 15). Although these limitations would preclude Plaintiff's return to her previous employment, she still had the residual functional capacity to perform medium work, as long as she avoided concentrated exposure to extreme cold, vibrations and hazards. (Tr. at 16). Because

---

[26]   Listing 1.04 describes the criteria for spinal disorders:

Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord. With:

    A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or

    B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours; or

    C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic non-radicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A-C.

[27]   Dr. Gilson did not examine Plaintiff when he prepared the Residual Functional Capacity Assessment. He reviewed Plaintiff's medical records and the report from Dr. Amos' examination. (Tr. at 275-291).

Plaintiff was able to perform the requirements of some jobs that are available in significant numbers in the local and national economies, including work as a small product assembler, production assembler, packager, and cleaner, the ALJ concluded that Matthews is not "disabled," as defined in the Social Security Act. Because of that, he denied her application for disability insurance benefits and supplemental security income benefits. (Tr. at 22). That denial prompted Matthews' request for judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a determination of whether it is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id*. A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

### *New Evidence*

On May 24, 2014, six weeks after the ALJ issued his decision, Matthews was hospitalized for three days at Alliance Healthcare Services, a mental health care center in Tennessee. (Tr. at 42). She was taken to that facility by ambulance, but there are no records which describe the treatment she received or the symptoms she exhibited. (Tr. at 41). She was discharged with prescriptions for gabapentin, Celexa, Trazodone, and Vistoril.[28]

Beginning in November, 2014, Matthews sought treatment in Texas through the Harris County Hospital District. (Tr. at 34). On December 9, 2014, she was seen by Angela Pickens, a registered nurse. (Tr. at 34-36). Among the complaints listed in the medical records are

---

[28] Trazodone is an antidepressant. Vistoril is a sedative used to treat anxiety.

depression, anxiety, spinal stenosis, fibromyalgia, migraines, right hip pain, muscle pain, back pain, hyperesthesia, and knee pain.[29]  (Tr. at 34).  Plaintiff was prescribed Cymbalta and Trazodone, and instructed to schedule an MRI of her lower back, as well as x-rays of both knees.[30]  (Tr. at 35).  Plaintiff was seen again on January 20, 2015, due to her back pain.  (See, Plaintiff's Original Complaint at pg. 33).  She was sent for behavioral counseling on February 10, 2015.  (Original Complaint at 34).  She returned to the medical clinic on February 23, 2015. (Tr. at 32).  Dr. Toug Tanavin, M.D., listed nerve pain and chronic lower back pain in his description of her complaints.  (Tr. at 32).  He referred her for occupational therapy and prescribed gabapentin, Flexeril, Cymbalta, Trazodone, and Abilify.  (Tr. at 32).  Three days later, she saw Dr. Huiping Xu ("Dr. Xu"), in the psychiatry department.  He ordered a psychological diagnostic evaluation.  (Original Complaint at 36).

Plaintiff began occupational therapy on February 27, 2015. (Original Complaint at 37). On March 10, 2015, the therapy was discontinued, after only four sessions, because of her purported pain level. (Original Complaint at 39).  At that time, the therapist reported that the "[doctor] ordered epidural spinal injection."[31]  She was seen by Hao Chi Zhang, M.D., on the same day, for treatment of her hypertension and low back pain.  (Original Complaint at 40). Matthews next saw Dr. Khannan Athreya on April 2, 2015.  (Tr. at 30).  She was treated for degenerative joint disease of the knee, degenerative joint disease of the lumbar spine, and benign hypertension.  (Tr. at 30).  She saw Dr. Xu in the psychiatry department on the same day.  (Tr. at 28).   Dr. Xu diagnosed Plaintiff as suffering from "major depressive disorder," and

---

[29]  Hyperesthesia is extreme sensitivity of one of the body's sense organs, such as pain or touch receptors in the skin. MOSBY's at 789.
[30]  Cymbalta can be used to treat anxiety or fibromyalgia.
[31]  There is no record of this spinal injection, but Plaintiff stated in her Original Complaint that she received an injection in her spine on August 5, 2015, and that it provided only minimal relief for two weeks.  (Original Complaint at 3).

"posttraumatic stress disorder." Her medications were continued and she was told to return in six weeks. (Tr. at 28-29). She also returned to physical therapy on April 9, 2015. At a visit on June 1, 2015, she was reported to have spinal stenosis, chronic back pain, and neuropathic pain, and her prescriptions were refilled. (Original Complaint at 44).

Plaintiff provided some of the medical records of her post hearing medical treatments in her request to the Appeals Council for a reconsideration of the ALJ's decision. She attached additional records to her district court Original Complaint. In doing so, she has presented new evidence to the Appeals Council and to this court. It is well settled that, "when the Appeals Council denies review after considering new evidence, the [Commissioner's] final decision 'necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence.'" *Higginbotham v. Barnhart*, 405 F.3d 332, 336-37 (5th Cir. 2005) (quoting *Perez v. Chater*, 77 F.3d 41, 45 (2d Cir. 2006)). It is equally settled that, in some circumstances, evidence that was unavailable, or that did not exist at the time of the hearing, may be cause for a remand of an individual's claim for benefits. *See id.*; *Ripley*, 67 F.3d at 555. The Fifth Circuit has outlined these circumstances, as follows:

> New evidence may be grounds for remand if it is material; this materiality inquiry requires determining whether the evidence relates to the time period for which the disability benefits were denied, and whether there is a reasonable probability that the new evidence would change the outcome of the Commissioner's decision.

*Castillo v. Barnhart*, 325 F.3d 550, 551-52 (5th Cir. 2003) (citing *Ripley*, 67 F.3d at 555). The new evidence must "dilute the record to such an extent that the ALJ's decision becomes insufficiently supported." *Petticrew v. Colvin*, Civ. No. 4:13-CV-2119, 2014 WL 2880019, at *10 (S.D. Tex. 2014) (citing *Higginbotham v. Barnhart*, 163 F.App'x 279, 281-82 (5th Cir. 2006). "Implicit in the materiality requirement ... 'is that . . . it not concern evidence of a later-

acquired disability or of the subsequent deterioration of the previously non-disabling condition.'" *Bradley v. Bowen*, 809 F.2d 1054, 1058 (5th Cir. 1987) (quoting *Johnson v. Heckler*, 767 F.2d 180, 183 (5th Cir.1985).

In this case, the new evidence submitted does not require a remand, because it does not relate to the time period at issue. These records, instead, show treatment that occurred after the ALJ made his decision. The records also do not provide an objective explanation for Plaintiff's complaints that would, in reasonable probability, change the ALJ's decision. *See, e.g. Ripley v. Chater*, 67 F.3d 552, 555-556 (5th Cir. 1995)(post decision surgical records that revealed scar tissue from an earlier surgery was new evidence that required remand, because the scarring could explain plaintiff's complaints of pain at the administrative hearing). The new evidence shows only that Plaintiff continued to complain of low back pain, depression and anxiety, and that she continued to receive conservative treatment for those conditions. At most, this new evidence suggests that Plaintiff's condition might have worsened after the ALJ made his decision, but that is not proof that she was disabled at the time of, or prior to, his decision. The Appeals Council correctly concluded that the new evidence did not require reversal or remand of the ALJ's decision. The new evidence presented by Plaintiff is not material because it does not relate to the relevant time period, and there is no reasonable probability that it would change the outcome of the Commissioner's decision.

### *There is substantial evidence to support the ALJ's decision*

As the movant, the Commissioner argues that there is substantial evidence to support the ALJ's decisions that Plaintiff's impairments were not severe, and that she had the residual functional capacity to perform a modified range of medium work. (Defendant's Motion at 4-13). In reaching these conclusions, the ALJ concluded that Matthews' testimony about the intensity,

persistence, and limiting effects of her symptoms was not entirely credible. (Tr. at 17). The ALJ noted that Plaintiff had received "little medical care" for her alleged complaints, and he accorded "great weight" to the opinions from the state agency examiners and consultants when deciding the level of Plaintiff's impairments, as well as her ability to return to work. (Tr. at 16, 18). Because the state agency experts saw only moderate limitations in a few areas of Plaintiff's ability to function, and, because the ALJ determined that Matthews still had the residual functional capacity to perform medium duty work, he concluded that she was not disabled. So long as there is substantial evidence to support his conclusions, the decision of the ALJ will not be disturbed.

In any disability determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). However, there is no question that an ALJ has discretion to weigh the credibility of the testimony presented, and his judgment on what weight to ascribe to it, is entitled to considerable deference. *See Villa v. Sullivan*, 895 F.2d 1019, 1024 (5th Cir. 1990); *Hollis v. Bowen*, 837 F.2d 1378, 1385 (5th Cir. 1988). In this case, Matthews testified that she is in constant pain, is barely able to lift a coffee cup because of pain and carpal tunnel syndrome, and that she stays in bed most of the day. She relies on others to prepare food for her, as well as to clean her house. She also told the ALJ that she is not able to drive, because of panic attacks, and that she suffers from depression which affects her ability to work. (Tr. at 16-18).

The ALJ must consider Plaintiff's testimony, but he is entitled to give less weight to her subjective testimony when that testimony is contradicted by objective medical evidence. *Wren v. Sullivan*, 925 F.2d 123, 128 (5th Cir.1991) (stating that the ALJ has considerable deference in determining the disabling nature of the claimant's subjective complaints). In fact, an ALJ is free

to accept or reject a claimant's subjective statements, so long as the reasons for doing so are made clear. *See Falco v. Shalala*, 27 F.3d 160, 164 (5th Cir. 1994); *Hollis*, 837 F.2d at 1385; SOCIAL SECURITY RULING ("SSR") 16-3p, 2016 WL 1119029, at *9–10. Here, the ALJ pointed out that Plaintiff acknowledged that she was able to live by herself, was able to prepare her own meals, do some laundry and light household cleaning, and shop for food, even though she often relied on others to do those chores for her. (Tr. at 17, 155-156). In addition, she watched television, read, and attended church activities. (Tr. at 17, 157). This, according to the ALJ, was "representative of a fairly active lifestyle and [was] not indicative of a significant restriction of activities." (Tr. at 17).

The ALJ further found that the objective clinical findings did not support the degree of pain and functional limitation that Matthews claimed to endure. (Tr. at 17). He emphasized that her treatment history did not suggest a person who was in constant pain, suffered from significant back pain, or debilitating depression or panic attacks. (Tr. at 17). When Plaintiff complained of persistent pain in her back, leg and hips in August, 2012, the treating nurse pointed out that Matthews had not received any treatment in several years. (Tr. at 17). At the time of the hearing, Matthews' treatment for her back pain consisted of a lumber injection ten years earlier, followed by periods of three years, and five years, during which she received no treatment at all. Matthews described symptoms of depression and panic attacks, but had never sought treatment from a mental health care provider, and she had never been hospitalized for any mental health issues. (Tr. at 16, 18).

The ALJ also noted that Plaintiff's diagnosed conditions were not consistent with the severity of her alleged symptoms. (Tr. at 16-17). Plaintiff had been diagnosed as suffering from chronic back pain due to degenerative disc disease, osteoarthritis, and headaches. (Tr. at 12, 17).

She had "mild spinal stenosis" in the cervical and lumbar spine. (Tr. at 13). But the ALJ pointed out that there is no evidence of nerve root compromise or spinal cord compression that would explain Plaintiff's complaints of pain throughout her extremities or the alleged difficulty in walking. (Tr. at 13-15). The neurologist who treated Plaintiff in February, 2013, could not explain why she complained of pain throughout her body. (Tr. at 18). The consulting examiners believed her to be exaggerating her complaints and not making full efforts during the examinations. At least one of her treating physicians agreed. (Tr. at 18, 332).

On these facts, the ALJ decided that Plaintiff's subjective complaints of back pain, panic attacks, and depression, which she said affected her ability even to get out of bed on some days, were not entirely credible. He further determined that those conditions were not severe impairments. Matthews' treatment was sporadic, her complaints varied from visit to visit, and her pain was apparently controlled by medication. Several doctors who examined Plaintiff believed that she was exaggerating her complaints, and questioned her effort on the examinations. Considering the entire record, there is substantial evidence to support the ALJ's decision that Plaintiff's testimony was less than wholly credible, and that her impairments were not severe.

### Plaintiff's Residual Functional Capacity

The ALJ also determined that Plaintiff had the residual functional capacity to perform medium work, although he limited her exposure to extreme cold, vibrations, and hazards.[32] Matthews could understand, remember, and carry out simple instructions and exercise appropriate judgment, according to the ALJ. She could also frequently relate to supervisors and

---

[32] Medium work involves lifting no more than fifty pounds at a time with frequent lifting or carrying of objects weighing no more than twenty-five pounds, as well as sitting, standing or walking for up to six hours in an eight hour work day.

coworkers, occasionally relate to the public, on a superficial basis, and deal with occasional changes in the work place. With these limitations, the ALJ concluded that Plaintiff could hold medium duty positions as a cleaner or packager, or light duty positions as a production assembler or small product assembler. (Tr. at 22).

In making these findings, the ALJ "relied heavily on the opinions of the state agency experts" which he found to be consistent with the record as a whole. (Tr. at 16). The ALJ pointed to the "scant objective medical evidence" for the period surrounding Plaintiff's alleged onset of disability, in 2009. (Tr. at 13) The ALJ explained that, even though Matthews used a cane at the hearing, there was no objective medical evidence to support her claim that she required it to walk. (Tr. at 16). The psychiatric evaluation by Dr. Gilson showed only moderate restrictions in her activities of daily life, social functioning, ability to concentrate and maintain work pace. He found no episodes of decompensation. The physical examination by Dr. Yates showed only a mild loss of motor strength in the upper extremities, and the doctor, in fact, questioned Plaintiff's effort. Dr. Yates further stated that Plaintiff presented in a "dramatic" fashion, and was slow to respond to instructions or perform exercises. (Tr. at 271). The doctor could find no reason for Plaintiff's complaints of pain throughout her body. (Tr. at 273). Matthews' treating neurologist was also unable to explain her complaints of pain over all of her body, and also believed that she was exaggerating her complaints. (Tr. at 316-317).

The ALJ concluded that the residual functional capacity he assigned to Plaintiff was consistent with the opinions from the state agency consultants. (Tr. at 20). He credited some of Matthews' statements about her limitations, even though she had received little medical care for those impairments, and had received no mental health treatment. (Tr. at 20). No treating medical source has expressed the opinion that Plaintiff is disabled, or placed any restrictions on

her activities. The ALJ found the opinions from the consulting examiners and state agency consultants to be consistent with the evidence as a whole, and this corroborated his conclusion that Plaintiff has only moderate limitations. (Tr. at 16-20). He discounted the low GAF score, assigned by Dr. Amos, because it was inconsistent with that examiner's other findings, and because, were Plaintiff's symptoms that severe, she would have sought mental health treatment. (Tr. at 20).

Here, it is clear that the ALJ considered both the subjective and objective evidence in assessing Plaintiff's credibility and complaints. *See Wingo*, 852 F.2d at 830. In questioning her credibility, he made specific references to the objective medical evidence to do so. *See Falco*, 27 F.3d at 164; *Hollis*, 837 F.2d at 1385; SSR 16-3p. As a result, the ALJ complied with the law in assessing Matthews' credibility, and his decision is entitled to considerable deference on that issue. *See Villa*, 895 F.2d at 1024; *Hollis*, 837 F.2d at 1385. The ALJ also described the medical evidence and opinions which support each step of his evaluation of Plaintiff's claim. There is substantial evidence to support the ALJ's decision at each step of the five step analysis. Because of that, his decision need not be disturbed. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452. A review of the pleadings and the record on file reflect that there is no genuine issue of material fact in this case, and summary judgment is therefore appropriate. As a result, the court recommends that Defendant's Motion for Summary Judgment be granted.

## CONCLUSION

Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**.

The Clerk of the Court shall send copies of the memorandum and recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28

U.S.C. § 636(b)(1). Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

SIGNED at Houston, Texas, this 1st day of August, 2017.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**